**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


S.P., *A MINOR, BY HIS PARENTS;*     )
J.A.P.; J.L.P., *AND ON THEIR OWN*     )
*BEHALF,*     )
                              Plaintiffs,     )
                                              )     **Civil Action No. 13-96E**
            vs.     )
                                              )     **Magistrate Judge Maureen P. Kelly**
FAIRVIEW SCHOOL DISTRICT,     )
                              Defendant.     )     **Re: ECF No. 23**


**OPINION**


**KELLY, Magistrate Judge**

This is a civil rights action arising out of alleged disability-based discrimination by the

Fairview School District against a former high school student who suffered refractory migraine

headaches preventing his regular attendance at school.  Plaintiffs, S.P., through and with his

parents, J.A.P. and J.L.P., ("S.P." and "Parents," respectively, or "Plaintiffs" collectively) allege

that Defendant Fairview School District (the "School District") failed to provide a Free

Appropriate Public Education ("FAPE") and discriminated against S.P. in violation of Section

504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) ("Section 504"), the Individuals with

Disabilities Education Act, 20 U.S.C. § 1400 *et seq* ("IDEA"), and Title 15 of the Pennsylvania

Code.   Plaintiffs seek declaratory and equitable relief, including an award of compensatory

education services. (ECF No. 1, ¶ 4).

Pending before the Court is Plaintiffs' Motion for Summary Judgment (ECF No. 23),

seeking the entry of judgment in their favor on their claim that the School District violated S.P.'s

"Section 504 right to an education with his non-disabled peers to the maximum extent appropriate to his needs." For the following reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 23) is DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Introduction

S.P. is now nineteen years old. During all times relevant to this action, he has resided with his parents and older sister in the School District. The record reflects that as a result of migraine headaches, S.P. was absent from school and/or failed to comply with cyber-school requirements for nearly his entire high school academic career. Plaintiffs claim that the School District discriminated against S.P. because of his physical and mental health disabilities, and therefore failed to correctly identify him as disabled pursuant to the IDEA. In addition, Plaintiffs allege that the School District failed to make necessary accommodations to permit S.P. to attend school with his peers, in the least restrictive environment. To remedy these alleged violations, Plaintiffs seek an award of compensatory education services.

The School District contends that S.P. does not qualify as a student with a disability under the terms of the IDEA because evaluations conducted in 2004 and 2008 confirm that he does not suffer cognitive or emotional impairments requiring specially designed instruction. Further, to the extent S.P. may meet the broader definition of disabled under Section 504 because of his incapacitating migraine headaches, the School District argues that it has provided all necessary accommodations with and without a formal Section 504 plan in place. Therefore, the School District contends that Plaintiffs have not established a violation of S.P.'s rights so as to entitle him to an award of compensatory education or any other requested relief.

The factual background of this action is derived from the undisputed evidence of record and the disputed evidence, viewed in the light most favorable to the nonmoving party. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").[1] Record evidence includes pertinent school records as well as extensive testimony before an impartial Pennsylvania Special Education Hearing Officer, conducted in four sessions over the course of five months during the summer and fall of 2012.

**B. Pre-2009 Medical and Educational History**

The record reflects that S.P. began suffering frequent refractory migraines at age 4 or 5. (Tr. 334). S.P.'s migraines typically last between 12 and 16 hours and require that he remain in a dark room away from noise. The precise cause for S.P.'s migraines has not been identified, but his father believes that S.P.'s triggers include changes in weather, lack of sleep, too much sleep, anxiety, and certain foods. Id. The School District does not challenge the documented diagnosis of S.P.'s medical condition.

Correspondence provided to the School District from treating physicians and specialists explains that S.P.'s incapacitating migraines require his frequent and legitimate absence from school. (ECF Nos. 28-7 – 28-11). As a result of his migraines, S.P. suffered a significant and increasing rate of absence in his primary school years, as follows:

| | |
|---|---|
| Kindergarten | 39.5 absences |
| First grade | 59.5 absences, 31 tardies |
| Second grade | 40.5 absences, 29 tardies |

---

[1] In resolving Plaintiffs' Section 504 claim, as reflected in Part III.B of this Opinion, this Court has viewed the evidence in the light most favorable to Plaintiffs.

| Third grade | 52.5 absences, 10 tardies |
| Fourth grade | 55 absences, 14 tardies |
| Fifth grade | 57 absences, 8 tardies |
| Sixth grade | 101 absences, 2 tardies |

The Parents often failed to provide written excuses for S.P.'s frequent absences, as required by Pennsylvania law. This led to the initiation of truancy-related judicial actions to confirm the underlying reasons for S.P.'s lack of attendance. In conjunction with resolving the truancy hearings, the parties entered into at least two Section 504 Service Agreements. The terms of a 2004 Service Agreement required the Parents to obtain medical excuses for S.P.'s absences for purposes of documenting compliance with Pennsylvania school attendance laws. (P-1). As part of the 2004 Service Agreement, the School District agreed to provide learning support during and after school on the days that S.P. was well enough to attend, so that he could receive instruction on missed material. These sessions were scheduled in the school resource room during non-core academic classes, ensuring he would not miss instruction in math, reading or science on the days he was well enough to attend school. (P-1).

At the Parents' request, S.P. was evaluated for the School District's gifted program during his fourth grade year. S.P. scored in the superior range intellectually and in the above-average to superior range academically, with a scaled I.Q. score of 120. These tests confirmed that S.P.'s migraines did not affect his learning capacity or cognitive abilities, and further confirmed that S.P. did not require a specially designed curriculum. (Tr. 710).

By sixth grade, S.P.'s 2008 504 Service Agreement incorporated in-home cyber education classes in Science, Social Studies and English. (P-1, pp. 5-6). S.P. was required to attend school only in the afternoon, just for Reading and Math classes, and only for 70% of

school days.  If S.P. was absent, the Service Agreement provided that missed assignments were to be sent to the office for the Parents to pick up each afternoon.  (P-1). Unfortunately, S.P. did not meet these reduced attendance and schoolwork completion goals.

### C.  2009 Settlement Agreement and Evaluation

 S.P. continued to frequently miss school and failed to comply with the abbreviated cyber program established for the first half of seventh grade. In January 2009, after the initiation of another truancy-related action, the parties entered into a Settlement Agreement, resolving all then-existing truancy issues, as well as federal and state claims arising out of S.P.'s "evaluation, identification, educational programming and/or educational placement." (P-10, S-8).

In accordance with the agreement, S.P. was to attend a partial hospitalization school-day program at Sarah Reed Children's Center ("Sarah Reed"), for a minimum of nine hours per week, in three-hour blocks of time.  S.P. was permitted to start the school day by 11:00 a.m. on days he woke feeling ill.  S.P. was also required to attend school at least once a month on a day that the Program's psychiatrist was available, so that he would receive appropriate psychological support.  Sarah Reed was to provide S.P. a private area to rest as he felt necessary, and the Parents agreed to provide a written excuse signed by themselves or by a medical doctor whenever S.P. was absent.   In the event S.P. was unable to meet the minimum attendance requirements, the School District and Parents agreed to reconvene to discuss other appropriate educational options for S.P., including residential treatment at Sarah Reed or full time in-home cyber school services.  Finally, the School District agreed to provide cyber school services to permit S.P. to access academic curriculum at home, with the goal of completing and passing each required seventh grade course prior to the start of eighth grade in the fall of 2009. (P-10, S-8).

In compliance with the 2009 Settlement Agreement, S.P. began attending Sarah Reed's partial hospitalization program. The Parents were immediately dissatisfied with the program, and S.P. attended only eight days; some days staying for just one hour. (Tr. 712, P-6). According to the father, during the orientation tour, the Parents were shown a restraint system and padded "lock up room" for children who misbehave. (Tr. 335-337). While there is no evidence S.P. misbehaved or was ever restrained or placed in a "lock up room," the father stated his son had difficulty attending because he did not want to be in the program. (Id.) In addition, S.P. had difficulty with "the environment" at Sarah Reed. (Tr. 332). At this point, the Parents opted for in-home cyber school, and it appears that for the remainder of seventh and eighth grade, S.P. did well.

In the months leading up to the 2009 Settlement Agreement, the School District performed an evaluation to determine whether S.P. was eligible to qualify as a disabled student under IDEA's rubric of "Emotional Disturbance".[2] Qualifying as disabled would have required

---

[2] A student becomes eligible for special education services under the IDEA if he suffers from a "Emotional Disturbance":

 (i) Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors;
(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
(C) Inappropriate types of behavior or feelings under normal circumstances;
(D) A general pervasive mood of unhappiness or depression; or
(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

the development of a specially designed curriculum memorialized with an Individual Education Plan ("IEP"). (Tr. 712-735). Kim Heberle, a certified school psychologist employed by the School District, compiled the components of the evaluation. (Tr. 703-710).

Heberle's evaluation was hampered by the repeated refusal of the Parents to provide input regarding S.P.'s behavior at home. According to the father, the family's attorney advised them not to complete a behavioral assessment for the evaluation process. (Tr. 345, 438-439). Heberle was unable to personally observe or interview S.P. for the evaluation because he did not attend school as scheduled, and she does not conduct in-home observations. (Tr. 743-744). In addition, Sarah Reed teaching personnel were unable and unwilling to evaluate S.P., because he attended the program for eight days and was not in school long enough to gather sufficient information to complete an assessment. (Tr. 749). Heberle did not seek evaluations from his sixth grade teachers because S.P. was out of school for much of the year. However, Heberle reviewed his academic records and determined that on those days he was able to attend school, S.P. never presented a behavioral concern or psychological issue that impaired his ability to

---

(ii) Emotional disturbance includes schizophrenia. The term does not apply to children who are socially maladjusted, unless it is determined that they have a serious emotional disturbance under paragraph (c)(4)(i) of this section.

34 C.F.R. § 300.8(c)(4). The regulatory definition delineates no fewer than four specific conditions a student must satisfy in order to qualify for special education services for being seriously emotionally disturbed: the student must demonstrate that he has (1) exhibited one of the five listed symptoms, (2) "over a long period of time," and (3) "to a marked degree," and (4) that this condition adversely affects his educational performance. Finally, the definition pointedly excludes students whose behavior is attributable to social maladjustment, unless they also suffer an independent serious emotional disturbance.

learn. Heberle also confirmed that correspondence provided to the School District by the Parents and S.P.'s doctors indicated that S.P.'s inability to attend school was solely the result of a medical issue caused by migraine headaches. (Tr. 717-723).

Heberle reviewed the psychiatric evaluation completed at Sarah Reed in conjunction with S.P.'s admission to the partial hospitalization program. (Tr. 710-786). This psychiatric evaluation, completed in the fall of seventh grade, indicates that S.P. has some psychological issues with stress and depression, but none severe enough to result in a disability for emotional disturbance. (P-4) The evaluation concludes that S.P.'s emotional issues do not affect his ability to learn or to take advantage of educational opportunities. As of the day of his exam on November 10, 2008, S.P. had accumulated 22 unexcused absences for the school year. During the exam, S.P. stated he was suffering a migraine. However, the psychiatrist noted that S.P. was not in distress, laughed, joked, "made good eye contact and appeared to be having an overall good time." (P-4, p. 1). S.P. reported that he believed he was bipolar, based upon research he conducted on the internet, but that he was not having symptoms of major depression. While sad at times, S.P. reported some happy times. The examining psychiatrist noted that S.P.'s anxiety, stemming from being worried or nervous about school, did not approach the level of panic disorder. S.P. revealed that he was doing well in the partial hospitalization program and worried less. He reported that he had no significant behavioral issues at school and was not participating in any outpatient psychological counseling. S.P. reported he had friends at school and at home. S.P. also indicated he had never received emotional or learning support services at school.

The Sarah Reed psychiatric exam revealed no evidence of abnormal mood or behavior, and S.P.'s judgment and insight "appeared to be fine." The psychiatrist found that S.P. was not suffering from Major Depression, but had mood variability. Medication for anxiety and

depression did not significantly improve his condition but no changes would be recommended in the absence of meeting with family. The evaluation resulted in a diagnosis of non-specified mood disorder, and an adjustment disorder with mixed anxiety and depression, as well as a recommendation that S.P.'s emotional issues be treated with Family Based Mental Health Services and participation in a program to build better coping skills to support school attendance. (P-4).

Heberle also reviewed a behavioral assessment completed by a School District-provided in-home math tutor, who worked with S.P. in November 2008 through January 2009. (P-6). During the months of November, December and January, there were thirteen in-home tutoring sessions, although another fifteen sessions were cancelled due to S.P.'s migraine headaches. The tutor indicated that during the sessions, S.P. was cooperative and worked hard. He did have some difficulty with number operations, likely due to not regularly attending school and failing to use mathematical operations on a consistent basis. However, S.P. "appeared to grasp most concepts with little difficulty when they were retaught." (P-6, p. 3) The tutor assigned scaled scores for the following categories: learning problems, interpersonal relationships, inappropriate behavior, unhappiness/depression and physical systems/fears. All of S.P.'s scores were well within the average range of most students in the standardized population, and he was "not rated to be in the serious level of any of the behavior problems." (P-6, p. 6).

In terms of academic progress, Heberle noted that in February 18, 2009, S.P. was enrolled in cyber classes for all course work, but as of March 10, 2009, he had only spent a total of eleven hours and seventeen minutes online. The School District sent a letter to the Parents expressing concern as to S.P.'s minimal progress.

Based upon the available information, Heberle determined that S.P. is an intelligent young man, with no significant behavioral issues, but who suffers "low motivation." (P-6, p.7). Accordingly, S.P. did not meet the criteria to satisfy "the federal definition of emotional disturbance" and so was neither disabled nor eligible for special education pursuant to the IDEA. (Id.)  In addition, Heberle found that S.P. did not meet the criteria for a disability requiring special education under the category "other health impairment." This conclusion was based upon her determination that while S.P.'s migraines constitute a health issue, they do not affect cognitive skills necessitating adaptation of the normal curriculum. (Tr. 759 – 764, 772). Accordingly, a Section 504 Plan was developed to document the recommended and requested accommodations for S.P.'s medical condition.

### D.  High School

After completion of the School District's evaluation by Kim Heberle in March 2009, S.P. remained in cyber-school for the remainder of seventh and all of eighth grade, through the summer of 2010.  There is no evidence of record that the family sought a change in S.P.'s Section 504 Plan or cyber school program. According to the father, while in the cyber program at home, S.P. was doing better, suffered fewer migraines and was no longer on medication. (Tr. 404).  Encouraged, the family decided to enroll S.P. at Fairview High School to start ninth grade with his peers.

In June 2010, Dr. Janet Wojtalik, the Director of Student Support Services for the School District, emailed the father and indicated that she was concerned that S.P. had not yet finished his eighth grade cyber courses, but was registered to start ninth grade at the high school in the fall. (S-9, p.3) The father responded, assuring Dr. Wojtalik that the course material would be finished.   In late July, the father reported that S.P. had finished all required classes and inquired

as to the upcoming date for freshman orientation.  Dr. Wojtalik provided the Parents with both the orientation date and with an appointment for the family to meet with S.P.'s guidance counselor so that S.P.'s class schedule could be created before orientation.  Dr. Wojtalik asked whether the Parents wanted a Service Plan in place for the High School, but the father declined, hoping none would be needed and suggesting a trial period for the beginning of the year.  (Tr. 499-500).

While S.P. did not have a formal Section 504 Service Plan in place, the School District had prepared and implemented a number of accommodations for him before the 2010-2011 school year began.   Starting with the initial August 2010 meeting with S.P.'s guidance counselor, a schedule was developed based upon the Parents' decision to place S.P. in college preparation level classes.  S.P. added a computer course as an elective, and after three or four discussions between the father and guidance counselor, S.P.'s schedule was "tweaked" to put his harder classes in the second semester.  It was hoped this would make the transition back to school as easy as possible.  (Tr. 604 – 607).

In addition, teachers were instructed that S.P. could have extended time to complete work, and if he missed school because of a migraine, teachers were to send work to the office for the father to pick up to permit work to be completed in the evening.  Teachers knew that if S.P. felt stressed or needed a quieter environment, he could use the school's resource room, known as the "Refocus Room," for academic or emotional support during the day.  S.P. was told that if he had a headache, he could go to the nurse's office and stay there until he felt better.  (Tr. 122, 125-126, 608).  Finally, individual sessions with a Sarah Reed mental health counselor were offered, but declined.  (Tr. 642).  While the father testified at the hearing below that he requested

a meeting with staff prior to the start of school and was "blown off," emails received and written by him during the summer before high school entirely refute this contention. (S-9, 1-3).

The record reflects that the 2010-2011 school year started well. Teachers reported that when S.P. was present in school, he was engaged and pleasant, never experienced an emotional outburst or showed signs of anxiety. He also never showed any indication that he was suffering from a migraine. He never said his head hurt, or that his vision was blurry; yet he would frequently call his father to pick him up from school with a migraine. (Tr. 575, 619-620, 671, 685, 691-2). By September 22, 2010, S.P. had missed fifteen days of his freshman year of high school.

Pursuant to School District procedure for any student who misses over ten days, a letter was sent to the Parents stating that a doctor's excuse would be required for future absences. (Tr. 608-611). Because S.P. continued to regularly miss school throughout the next three months, the School District informed the Parents that truancy proceedings might be pursued. The Parties met multiple times to adjust the accommodations for S.P., and the School District requested that the Parents obtain suggestions from S.P.'s treating physicians to make it possible for S.P. to succeed and attend school. The record reflects that no suggestions were forthcoming from anyone involved in S.P.'s medical care, with the exception of one letter requesting that a two-month trial of new treatments be permitted before placing S.P. in an exclusively in-home cyber-school program. (Tr. 469-473,761-766, S-37, p. 5).

In the absence of additional physician input, the School District continued its efforts to provide support by collecting missed work for S.P. to complete at home, and by assigning him for two periods a day to the Refocus Room. The record reflects that the Refocus Program provided S.P. access to a certified teacher and a behavioral counselor, as well as access to a

computer, so that he could make up missed work while attending school or have refuge if he felt anxious. (Tr. 559, 564). In addition, the School District dropped a failing Spanish class from S.P.'s schedule so that his transcript would not reflect a poor grade. S.P. was permitted to arrive at school at any time during the day if an early morning headache eventually subsided. (Tr. 123, 611-626). S.P.'s regular classroom teachers were available for assistance after school or by phone during the day if S.P. had curriculum-related questions. (Tr. 525). His guidance counselor also frequently met with S.P.'s teachers to develop strategies to provide missing work. (Tr. 615).

The record reflects the father's displeasure with these accommodations. Because the Refocus Room was used for both academic support and in-school suspensions, the father and Plaintiffs' special education expert, Andrew Klein, characterized the program as punitive. (Tr. 361-362). However, he record reflects that this resource program is widely acclaimed for providing academic support for any student who misses school for any reason, and for providing a place for students who need support, regardless of whether they are in general education or special education programs. (Tr. 492-495).

The evidence provided at the hearing reflects that the Refocus Room maintains a log of all students who use the room each day. During the months of September through December 2010, there were only two occasions when a student serving an in-school suspension was in the room with S.P. (Tr. 569-570). The Refocus Room had an average of five students per period, and approximately twenty students per day, with the overwhelming majority using the program to make up missed tests or to get academic support and tutoring. (Tr. 558).

After removing Spanish from S.P.'s schedule, he was assigned to the Refocus Room for fourth period every day, when S.P. opted to take a cyber Sociology course in lieu of Spanish. (Tr. 572). The teachers in the Refocus Room tracked S.P.'s missing work and provided missing

worksheets or tests for the days he missed school due to a migraine, and provided other support as needed. Testimony by one of the teachers indicates that S.P. was always friendly and well-behaved when in the Refocus Room, and engaged often and appropriately. (ECF 28-5, p. 7-11).

The Parents were also dissatisfied with the School District's insistence that S.P. complete school work. Rather, the Parents wanted the School District to accommodate S.P by simply permitting him to sit in a regular classroom. The father testified he does not care "if he sat there and he played tic-tac-toe for four hours a day." (Tr. 370). He believes that if S.P. was permitted to sit in a classroom with his peers, eventually he would choose to participate, attend regularly and complete school work.

By November 16, 2010, it was clear the existing plan was not working. Assignments left in the office were not picked up by S.P.'s parents nor were they turned in. At some point, it was decided that teachers would stop sending work home until previous assignments were picked up, so that S.P would not be overwhelmed by the amount of make-up work. (Tr. 629).

During the fall of 2010 and January 2011, the Parents sought medical care for S.P.'s migraines with new treating physicians. The first, Dr. Olga Selioutski, D.O., forwarded a note to the School District on September 29, 2010, indicating that treatment for S.P.'s migraines would include modifying his medication, as well as S.P.'s diet and sleep habits, and would include behavioral therapy to provide strategies to modify headache intensity and frequency. (S-37, p. 5). She requested that S.P. be permitted to attend school as he was able for a two month period before implementing an in-home cyber-school program. Her suggestions were followed. However, on October 26, 2010, the high school principal wrote to Dr. Selioutski noting that S.P. had missed 25 of 37 school days. The letter indicates that the School District welcomed her suggestion that S.P. attend school even with a headache and remain in the nurse's office until it

passed. However, S.P. did not use this strategy, opting to stay at home. The principal requested that Dr. Selioutski provide a written note excusing future absences because of intermittent migraine headaches and indicated that such a blanket note would satisfy the attendance auditor's requirements. (P-11, p.1). Dr. Selioutski provided a written excuse for absences up to November 11, 2010, at which point she indicated she was no longer treating S.P.

On November 19, 2010, the high school guidance counselor wrote to S.P.'s father, indicating that S.P. had not completed assigned work, was failing classes and that a doctor's excuse had not been provided for absences after November 11, 2010. (P-13). The letter expressed frustration with the lack of compliance with any accommodation offered and indicated that home schooling or in-home cyber school were likely the only options available for S.P. to pass his classes. Finally, the guidance counselor mentioned that in the absence of a doctor's excuse for future absences, truancy proceedings would be filed.

This letter prompted a meeting in early December 2010 between with School District personnel and the Parents. S.P.'s schedule was changed so that S.P. could be enrolled in cyber classes for two courses he was failing. S.P. was assigned English and Wellness cyber classes for his first two morning classes, followed by a Foods class in school, and then the cyber class in Sociology which had replaced his Spanish class, also to be taken in the Refocus Room. The remainder of his day at school was unchanged. (Tr. 371, 640). Refocus Room staff was assigned to function as S.P.'s liaison with teachers and to answer any questions related to the cyber classes. (Tr. 640). The School District agreed to average his cyber scores with his first quarter grades.

These changes eliminated any requirement for S.P. to arrive at school prior to third period and also eliminated attendance monitoring at the high school. In addition, the parties agreed that

as of January 24, 2011, S.P. would be enrolled full-time in an in-home cyber-education program, requiring that he work only 20 hours per week to complete only three courses by the end of the year for promotion to tenth grade. (P-15).   The Parents were also informed that for the remainder of the first semester and for all of the second semester, failure to complete 20 hours per week would be recorded as an absence for any day S.P. did not work for four hours, and this would require a written excuse.

By the end of January 2011, S.P. had not worked for 20 hours a week for any of his first semester classes.  (P-16).  In one week he worked only 9.5 hours and the most he worked in any week was 16.5 hours.  S.P. began treatment with a new physician on January 13, 2011, who provided a written excuse on January 24, 2011, for seven dates in the month of December 2010. The written excuse stated that the absences were caused by refractory migraines. (Exhibit P-10, S-37, p. 12).

The hearing for the truancy proceedings initiated in December 2010 occurred in February 2011. (Tr. 636).  During the hearing, Plaintiffs' counsel questioned the absence of a Section 504 plan and was reminded that a plan had been offered prior to the start of the school year, but had been refused.  The District Magistrate presiding over the hearing requested that the parties convene and prepare a Section 504 plan so that attendance issues could be formally addressed by the School District. (Id.).

In conjunction with the March 2011 truancy hearing, the School District developed a new Service Agreement, which provided for cyber-school at home, with monitoring and assistance available through the Refocus Room staff.  At the Parents' request, the cyber education program originally selected by the School District was replaced with a program preferred by the father and success was measured by completion of subject matter material rather than time spent on

content. (P-17, Tr. 424). Refocus Room staff members were available for support and communication of progress via phone, email or school visits. In addition, when S.P.'s condition allowed him to attend school with some regularity, he was permitted to attend or audit general education classes without credit, and not subject to grades. Finally, S.P. was permitted to participate in all extracurricular activities for non-disabled peers, "subject to the same accountability measures for participation." (Id.). The Parents agreed to the Service Agreement in May 2011.[3] (S-6).

A cyber school completion outline for each course was established and communicated to S.P. (S-28). On March 9, 2011, S.P. needed to finish 21 History lessons, 46 Sociology lessons and 9 Health lessons. As of April 6, 2011, S.P. had completed his Health requirements, but had finished only one History lesson, and eleven Sociology lessons. (S-29).

By May 26, 2011, the School District extended S.P.'s school year to permit completion of the History and Sociology courses on or before July 1, 2011. Upon finishing the two courses, S.P. was to complete 9th grade Science, English and Math cyber courses and then be promoted to 10th grade. It was envisioned that S.P. would start the Fall 2011 semester as a second semester 9th grader. (P-17, P-18). S.P. completed only four of his original 9th grade courses, Health, Foods, U.S. History and Sociology, but as of August 30, 2012, he had not yet completed Science, English or Math. (S-41).

Over the course of the following year, through the winter, spring and summer of 2012, S.P. made minimal progress on his remaining 9th grade courses. (S-41-S45). His father routinely asked S.P. if he was completing his cyber course work, but was reluctant to force the issue, given

_____

[3] It is undisputed that S.P. did not audit any courses or participate in any extracurricular activities.

his own lack of faith in cyber education. (Tr. 409-413). The father acknowledges that S.P. has a car and a driver's license, and spends time on his computer and X-box. (Tr. 414-415).

A Modified Service Agreement was entered into by the parties on January 26, 2012. Pursuant to this agreement, S.P. remained in at-home cyber classes, with progress measured by the completion of content within a semester or quarter, depending upon the number of courses he elected to complete at any time. (S-7). If S.P. opted for two courses, he was provided 45 days for completion; if he opted for four courses, he was provided an entire semester. Mandated attendance policies were waived with appropriate quarterly medical excuses documenting a diagnosis, prognosis and school attendance limitations. In addition, the Modified Service Agreement provided that when S.P. felt well enough to attend school regularly, he would be permitted to attend or audit general education classes without grades or credit and could participate in all extracurricular activities available for non-disabled peers. (S-7).

On January 17, 2012, S.P.'s treating physician provided a written excuse for attendance in the cyber program, indicating that S.P. continued to suffer from refractory migraines but stated that the cyber school program "is tailored to him very well. He can take breaks when he has extreme migraines which are frequent in his case. I would advocate for him continuing cyber schooling which works well by his report to me in reference to adjusting his lifestyle for his interruptive migraines." (S-37, p. 13).

S.P.'s academic records through August 21, 2012, indicate that S.P. has not yet completed the 9th grade cyber courses required for promotion to 10th grade, including English, Algebra and Science. His grades for the five completed lessons in the Science course are 100%, 93.3%, 100%, 100% and 75%, respectively.

**E. Testimony of Plaintiffs' Expert, Andrew Klein**

At the Special Education hearing on August 30, 2012, Plaintiffs presented the testimony of a special education consultant, Andrew Klein. Mr. Klein has a master's degree in education, and is not a psychologist or psychiatrist, but has worked over the years in several special education administrative roles. (Tr. 182- 187). With regard to this case, Mr. Klein did not speak with any of S.P.'s treating physicians and concedes that S.P.'s migraines are a medical condition, for which he has no expertise. (Tr. 188).

Mr. Klein concedes that S.P. does not need specially designed instruction in terms of curriculum because he has the cognitive capabilities to understand and master the material. However, Mr. Klein believes that the School District erred in failing to identify S.P. as disabled under the "Other Health Impaired" category, because the migraines caused poor school attendance. Alternatively, Mr. Klein believes S.P. was inadequately screened as an emotionally disturbed young man. He finds fault with evaluations conducted by the School District because input from a school nurse, prior teachers and treating physicians was not obtained. (Tr. 221). Mr. Klein contends that the School District also violated its statutory obligations to S.P. by failing to retain a consultant and/or reaching out to teaching hospitals, neurologists, and behavioral specialists to work with the family and school for new ideas to encourage S.P. to attend school. However, Mr. Klein concedes that S.P.'s migraines are real and he does not dispute S.P.'s need to be in a quiet, dark area to rest until the migraines pass. (Tr. 276).

According to Mr. Klein, if S.P. had been identified correctly as disabled under the IDEA and applicable regulations, he would have qualified for an IEP, which could have incorporated *inter alia*, the assignment of a teacher to accompany him throughout the day at school to address anxiety, as well as specially designed instruction, a case manager to monitor his performance in

school, counseling through a district provided psychologist or guidance counselor, the ability to arrive at school at the end of the day for tutoring as well as transportation to school at whatever time he was able to leave home, including at the end of the regular school day. (Tr. 224-226, 228, 259-260).

Mr. Klein also noted that an IEP could have provided a place for S.P. to decompress, such as a nurse's office or guidance office. Mr. Klein testified that the School District should have adapted the curriculum so that S.P. could start and stop at any point as necessary, and that he was penalized based upon his disability because he was not offered a reduced course load, supportive staff or options to be taught during the summer in the school building. (Tr. 236-238).

Mr. Klein believes that part of the educational experience is behavior and building relationships with peers, which S.P. missed while receiving his courses at home through cyber school. (Tr. 227, 233, 300-301). Mr. Klein believes it was the School District's obligation to find a way for S.P. to connect with peers in the school building, by finding and requiring peers to connect with him to encourage attendance. (Tr. 258-259). In addition, while Mr. Klein has never observed the operation of the School District's Refocus Room program, he believes it was inappropriate for S.P. to be placed in the program for one to three periods per day because students serving in-school suspensions are also placed the Refocus Room. Mr. Klein believes that all students in the Refocus Room are restricted from moving freely about the room and walking unaccompanied to the bathroom. (Tr. 262-263).

Mr. Klein believes the School District should have better accommodated S.P. by permitting him to attend school at any point in the day, and that round-trip transportation should have been available whenever S.P. decided to attend school during or after normal school hours.

(Tr. 259- 260, 324).  In addition, Mr. Klein testified that the School District should have conducted a functional behavior assessment and behavioral support plan.

On cross-examination, Mr. Klein conceded that migraines are a medical issue, and he does not dispute the Parents' explanation of missed school days due to migraine headaches.  (Tr. 268-269, 276).  Mr. Klein agrees that there is no evidence that after February 2009, S.P. was diagnosed or treated for any mental illness, depression or anxiety, or displayed any behavioral or emotional concerns while in school.  (Tr. 270).

Mr. Klein agrees that cyber-school is appropriate for children who cannot attend school for medical reasons, and that a cyber program permits a student to take breaks as necessary.  (Tr. 295-297).  However, he views cyber education as failing the School District's requirement to provide the least restrictive educational environment meeting S.P.'s needs.  (Tr. 310-313).

A thorough review of the evidence of record reveals that Plaintiffs have not produced any psychological or psychiatric evidence that S.P.'s absences after March 2009 were related to anything other than beginning the day with a migraine headache. Further, there is no medical or psychological evidence that S.P.'s migraines result from any otherwise undocumented mental health condition, or that he suffered any debilitating mental health condition precluding or interfering with his attendance at school.

**F.  Due Process Complaint**

On December 7, 2011, Plaintiffs filed an administrative due process complaint with the Pennsylvania Department of Education, Bureau of Special Education, through the Office for Dispute Resolution ("ODR").  Plaintiffs alleged that the School District violated Section 504 and applicable federal and state regulations by discriminating against S.P. on the basis of his disability by failing to develop a service agreement to provide appropriate accommodations,

modifications and services to permit his attendance at school. Plaintiffs further alleged that the

School District violated the IDEA by failing to identify S.P. as a child with a disability under

either the "Other Health Impairment" or "Emotional Disturbance" classifications. Finally,

Plaintiffs alleged that the School District violated the IDEA, Section 504 and applicable

regulations, by failing to educate S.P. in a regular educational setting, and intentionally

discriminated against him by initiating truancy proceedings. (P-11).

The ODR Special Education Hearing Officer conducted a hearing over the course of

several months, and issued a decision in favor of the School District on January 7, 2013, as to all

claims.[4] (ECF 23-3). Plaintiffs appealed this decision by filing the present case before this

Court.

## II.     STANDARD OF REVIEW

### A. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); <u>see</u> <u>also</u> <u>Celotex Corp. v.

Catrett</u>, 477 U.S. 317, 322 (1986). "[T]his standard provides that the mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no genuine issue of material

fact." <u>Anderson</u>, 477 U.S. at 247–48 (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the

outcome of the case under applicable substantive law. <u>Id.</u> at 248; <u>Gray v. York Newspapers, Inc.</u>,

---

[4] The ODR hearing of this matter occurred on July 2, 2012, August 30, 2012, September 6, 2012, and November 8, 2012.

957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992).  In order to avoid summary judgment, however, an opposing party may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); see Celotex, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).

Parties must produce evidence to show the existence of every element essential to their case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323; see Harter v. G .A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992). Such evidence may include "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declaration, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P 56(c)(1)(A).  Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, and entitle the

court "to grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

**B. Review of the ODR Hearing Officer's Findings of Fact and Conclusions of Law**

Plaintiffs seek to reverse the findings of fact and conclusions of law of the ODR Hearing Officer with regard to whether the School District violated S.P.'s rights under Section 504 of the Rehabilitation Act. The Court exercises plenary review over the Hearing Officer's legal conclusions. <u>Carlisle Area Sch. Dist. v. Scott P.</u>, 62 F.3d 520, 524 (3d Cir. 1995). The parties disagree, however, as to the deference to be accorded the Hearing Officer's findings of fact.

Citing <u>Carlisle Area Sch. Dist. v. Scott P.</u>, the School District asserts that this Court should apply a "modified *de novo* review." (ECF No. 26, p, 5). Under this standard, a district court must accord "'due weight' and deference" to the administrative findings and give the Hearing Officer's factual findings the benefit of *prima facie* correctness. <u>Id.</u> Additionally, any testimony and credibility determinations must carry special weight and may only be disturbed if "the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." <u>Id.</u> (quoting <u>Shore Reg'l High Sch. Bd. of Educ. v. P.S.</u>, 381 F.3d 194, 199 (3d Cir. 2004) (emphasis removed).

Plaintiffs contend that the deferential "due weight" standard does not apply to factual findings in Section 504 disputes because "unlike the IDEIA, Section 504 lacks statutory language supporting a modified *de novo* review and the Third Circuit has not yet determined the applicable standard of review." (ECF No. 30, p, 1). However, as observed by the Court in <u>T.F. v. Fox Chapel Area Sch. Dist.</u>, No. 12-1666, 2013 WL 5936411 (W.D. Pa. Nov. 5, 2013), as well as the cases cited therein, the precise standard of review for a Section 504 claim need not be resolved because, even under the modified review standard, the Court has discretion to defer or

not defer to administrative findings. <u>See</u>, <u>e.g.</u>, <u>Centennial School Dist. v. Phil L. ex rel. Matthew L.</u>, 799 F. Supp.2d 473, 482 (E.D. Pa. 2011). In this case, the Court will apply a *de novo* standard of review.

## III. DISCUSSION

### A. Plaintiffs' Section 504 Claim

Plaintiffs contend that beginning in the second half of seventh grade, the School District violated Section 504 by failing to educate S.P. in the most integrated setting with his non-disabled peers to the maximum extent appropriate to his needs. In particular, Plaintiffs allege that the School District failed to adopt accommodations that could have enabled S.P. to attend school with his peers, in the least restrictive setting. Accordingly, Plaintiffs contend that S.P. was denied the benefits afforded his non-disabled peers and was subject to discrimination because of his disability.

The Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" under any program that receives federal funds. 29 U.S.C. § 794(a). This prohibition was extended to public school systems through Section 504. <u>Id.</u> § 794(b)(2)(B).

To prevail on their claim under Section 504, Plaintiffs are required to prove that: (1) S.P. is disabled; (2) he was "otherwise qualified" to participate in school activities; (3) the School District received federal financial assistance; and (4) S.P. was excluded from participation in, denied the benefits of, or subject to discrimination by the School District. <u>Ridgewood Bd. of Educ.</u>, 172 F.3d 238, 253 (3d Cir. 1999*), superseded by statute on other grounds*, 20 U.S.C. § 1415(f)(3)(C), *as recognized in* <u>P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.</u>, 585 F.3d

727, 730 (3d Cir.2009)).  The plaintiff does not need to prove that the district's allegedly

discriminatory acts were intentional; however, the record must contain some evidence

demonstrating "that the [school district] acted on the basis of [the student's] disability." See Eric

H. by his parents John and Janet H. v. Methacton Sch. Dist., 265 F. Supp.2d 513, 523 (E.D. Pa.

Feb.13, 2003).

      In Ridley Sch. Dist. v. M.R., 680 F.3d 260 (3d Cir. 2012), the United States Court of

Appeals for the Third Circuit explained the parameters of obligation owed by a school district

under Section 504.

> As we have explained, § 504's "negative prohibition" is similar to the IDEA's
> "affirmative duty" and also requires schools that receive federal financial
> assistance to "provide a free appropriate public education to each qualified
> handicapped person who is in the recipient's jurisdiction." Matula, 67 F.3d at
> 492–93 (quoting 34 C.F.R. § 104.33(a)). To offer an "appropriate" education
> under the Rehabilitation Act, a school district must reasonably accommodate the
> needs of the handicapped child so as to ensure meaningful participation in
> educational activities and meaningful access to educational benefits. See J.D., 224
> 3d at 70 (citing Alexander v. Choate, 469 U.S. 287, 300 n. 20, 105 S. Ct. 712, 83
> L.Ed.2d 661 (1985)); D.S., 602 F.3d at 556 (explaining that under the IDEA, a
> state must supply an education that provides "significant learning" and
> "meaningful benefit") (citation omitted); Ridgewood Bd. of Educ., 172 F.3d at
> 253. However, § 504 does not mandate "substantial" changes to the school's
> programs, Se. Cmty. Coll. v. Davis, 442 U.S. 397, 405, 99 S. Ct. 2361, 60
> L.Ed.2d 980 (1979), and courts "should be mindful of the need to strike a balance
> between the rights of the student and h[er] parents and the legitimate financial and
> administrative concerns of the [s]chool [d]istrict," J.D., 224 F.3d at 70–71
> (internal marks and citation omitted). But "[t]he fact that it is more convenient,
> either administratively or fiscally, to provide services in a segregated manner,
> does not constitute a valid justification for separate or different services." Helen
> L. v. DiDario, 46 F.3d 325, 338 (3d Cir.1995) (quoting H.R.Rep. No. 485,
> reprinted in 1990 U.S.C.C.A.N. at 473).

Id. at 280-81. The regulations promulgated under Section 504 ensure that an eligible child

receives a FAPE by requiring that the student be provided with "regular or special education and

related aids and services that ... are designed to meet individual educational needs of [disabled]

persons as adequately as the needs of [non-disabled] persons are met." 34 C.F.R. § 104.33(b).

Section 504 regulations also provide that school districts must comply with procedural requirements related to least restrictive settings, evaluations, and access to procedural due process. Id. This obligation mirrors that required under the IDEA, which provides that "[t]o the maximum extent appropriate, children with disabilities … are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A).

In Oberti v. Bd. of Educ., 995 F.2d 1204 (3d Cir. 1993), the United States Court of Appeals for the Third Circuit adopted a two part test to determine if a school district has satisfied this "mainstreaming" requirement under the IDEA. First, the Court must assess whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily. Id. at 1215. This requires consideration of several factors, including: (1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom with supplementary aids and services; (2) a comparison of the educational benefits available in a regular class and the benefits provided in a special education class; and (3) the possible negative effects of inclusion on the other students in the class. Id. at 1220. If the child cannot satisfactorily be educated within the regular classroom and placement outside the class is necessary, then the Court must decide whether "the school has included the child in school programs with nondisabled children to the maximum extent appropriate." Id. at 1218 (citation omitted).

In this action, it is beyond dispute that if S.P. wakes with a migraine headache, he cannot physically be educated with his peers in a regular classroom or participate in school programs

because S.P. cannot attend school. His father has testified that if S.P. wakes with a migraine, he must remain in bed in a quiet dark room for 12-16 hours, until his headache subsides. The record contains ample documentation provided by S.P.'s treating physicians, beginning in 2005 and through 2012, indicating that his migraines are refractory, unremitting, and constitute a legitimate reason for excessive absenteeism.

Plaintiffs argue that some of the post-2009 absences and some migraines may be due to school-related stress. However, there is no medical or competent psychological evidence of record supporting this assertion or any causal relationship between S.P.'s migraines and stress or anxiety. Instead, it appears that beginning sometime prior to 2009, S.P. was not capable of regularly attending school or participating in any school sponsored program other than in-home cyber education courses, which permit him to start and stop as his medical condition requires. The appropriateness of this program was specifically commended by S.P.'s treating physician as late as 2012.

In considering the Oberti factors, the Court finds that as to the first prong, given the unique medical issues facing S.P., the School District has made extraordinary efforts to accommodate S.P. in a regular education environment beginning in 2009. The record establishes that academic expectations and schedules were changed numerous times to ensure that S.P. could successfully complete curriculum both in school and at home. When attendance in regular classrooms on a typical schedule could not be accomplished, his educational needs were met by placement in the Refocus Room program, where he worked alongside a small number of peers each day. When a full day in school was not possible, S.P. was permitted to attend school beginning fourth period, or whenever his condition allowed. As a last resort, when attendance even part day could not occur, he was placed in in-home cyber school courses.

With regard to the second <u>Oberti</u> prong, the Court finds that the School District has included S.P. in school programs to the maximum extent appropriate. S.P. was never barred from participation in extracurricular events if he felt able, and his high school Section 504 plans specifically incorporated provisions permitting him to audit courses without grades when and if he was well enough to attend school on a somewhat consistent basis. Furthermore, the overwhelming evidence regarding the Refocus Room program indicates that on the days he was able to attend, the program permitted S.P. to make up missing work and participate in cyber classes alongside a small number of other students using the room each day.

None of the accommodations offered by the School District can reasonably be characterized as "token gestures." In-home cyber-school is certainly the most restrictive option, but the record establishes that it is the least restrictive *appropriate* educational environment for S.P., which is all that is required under either the IDEA or Section 504. <u>Id.</u>, at 1213 (IDEA requires an education to be appropriate and provided in the least restrictive environment).

Through Mr. Klein, Plaintiffs have presented a litany of possible alternative measures that they believe could have been employed by the School District to address S.P.'s migraines "in school," including consultations with outside agencies and reaching out to medical experts or teaching hospitals. (ECF No. 30, p. 4). However, each of these measures assumes that S.P. is able to be "in school" and that his refractory migraines can be controlled such that he does not need to stay at home until a migraine passes. The overwhelming evidence, to the contrary, supports the conclusion reached by S.P.'s treating neurologist that his medical condition renders cyber-school an option that "works well … in reference to adjusting his lifestyle for his interruptive migraines." (S-37, p. 13).

Alternatively, Plaintiffs posit that S.P.'s migraines are caused by stress and anxiety and the School District's failure to address and accommodate these psychological issues is evidence of its violation of Section 504. (See, e.g., Id. at 3-4). Plaintiffs find fault with the School District's failure to contact mental health professionals, implement social work services, parent counseling and training, a behavioral support plan or other possible services. However, the evidence of record fails to support a finding that S.P.'s migraines or excessive absenteeism are causally related to any mental health condition such that the School District was under an obligation to employ or investigate these measures so that S.P. could otherwise attend school.[5]

This Court is certainly sympathetic to S.P.'s medical condition, the burden of chronic migraine headaches, and the limitations it has placed upon his ability to attend school in a regular environment. However, Section 504's guarantee of a free appropriate public education in the least restrictive environment promises only the opportunity to a meaningful education and inclusion in school programs with non-disabled peers to the maximum extent appropriate. In this case, based upon the fully developed administrative record below, there is no doubt that the School District has consistently endeavored to include S.P. in a regular educational environment with his non-disabled peers, but S.P.'s medical condition has made that impossible. Furthermore, Plaintiffs have pointed to no evidence in the record that would demonstrate that the School District acted on the basis of S.P.'s migraine-related disability to discriminate against

_____

[5] Plaintiffs point to a single letter authored in November 2007, by a physician no longer involved in S.P.'s care, who stated that S.P. was treated for "symptoms of depression since October 3 [2007] … In part, his depression is due to frequent migraines and associated school absences." (S-37, p. 4). This letter does not support Plaintiffs' contention that S.P. was absent from school because of symptoms of depression or any other mental health condition but, rather, that S.P. was suffering symptoms of depression because he was absent as a result of his migraines.

S.P. in violation of Section 504. Accordingly, Plaintiffs are not entitled to summary judgment on their Section 504 claim.

**B. Propriety of Summary Judgment in favor of School District**

The Court notes that Defendant did not file a cross-motion for summary judgment as to either Count I, Plaintiffs' Section 504 claim, or Count II, Plaintiffs' claim under the IDEA that the School District failed to evaluate and identify S.P. as a child with a disability for the period March 2011 through March 2013.

With regard to Plaintiffs' Section 504 claim, however, the Court will *sua sponte* enter judgment in favor of Defendant. While district courts must generally give notice prior to granting summary judgment so that a party may present relevant evidence, there is a narrow exception where (1) the point at issue is purely legal; (2) the record is fully developed; and (3) the failure to give notice does not prejudice they party. Gibson v. Mayor & Council of City of Wilmington, 355 F.3d 215, 219 (3d Cir. 2004). In these situations, the plaintiff "had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward." Id. at 223–24 (discussing elements of adequate notice); and see Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). In this matter, as the moving party, Plaintiffs clearly marshaled the evidence to support their Section 504 claim and therefore are not prejudiced by the lack of notice that summary judgment could be entered against them *sua sponte.*

With respect to Plaintiffs' IDEA claim, Plaintiffs filed a memorandum in response to this Court's order requiring supplemental briefing addressing, *inter alia*, whether any justiciable claims would remain in the event this Court concluded that Defendant was entitled to the entry of judgment as to Plaintiffs' Section 504 claim. (ECF No. 31). In their response, Plaintiffs stated that they are entitled to recover compensatory education and other equitable remedies in light of

the School District's prima facie violation of the IDEA. (ECF No. 33). However, Plaintiffs did not marshal any evidence establishing a prima facie violation of the IDEA and the Court notes that its order did not expressly place Plaintiffs on notice that the Court considered the issue susceptible to the entry of judgment in favor of Defendant *sua sponte.*

Defendant responded to the Court's order for supplemental briefing, claiming that Plaintiff's failure to appeal the decision of the ODR Special Education Hearing Officer to the Pennsylvania Special Educational Due Process Appeals Review Panel renders the IDEA claim subject to dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, for failing to exhaust administrative remedies. (ECF No. 32). However, Defendant did not cite to relevant Pennsylvania procedure and the parties have not addressed whether or when a party aggrieved by the Hearing Officer's decision may file an appeal in federal district court without first appealing to the state appeals panel. See, e.g., Batchelor v. Rose Tree Media School District, 759 F.3d 266 (3d Cir. 2014).

Because it is apparent that issues remain for resolution with regard to Plaintiffs' IDEA claim, a supplemental briefing order will be issued.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment [ECF No. 23], as to their Section 504 claim, is DENIED. Because it is apparent that the School District is entitled to the entry of summary judgment as a matter of law on Plaintiffs' Section 504 claim, judgment will be entered in favor of the School District as to Count I of Plaintiffs' Complaint. A supplemental briefing order will be issued as to Count II – Plaintiffs' IDEA claim. An appropriate Order follows.

# ORDER

AND NOW, this 30th day of September 2014, upon careful consideration of Plaintiffs'

Motion for Summary Judgment [ECF No. 23] with respect to Count I of the Complaint, and the

briefs filed in support and opposition thereto, as well as the supplemental briefs and extensive

exhibits filed by the parties, and for the reasons set forth in the accompanying Opinion, IT IS

HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment is DENIED.

IT IS FURTHER ORDERED that with respect to Count I of Plaintiffs' Complaint, and

for the reasons set forth in the accompanying Opinion, judgment is entered in favor Defendant.

IT IS FURTHER ORDERED that, pursuant to Rule 4(a)(1) of the Federal Rules of

Appellate Procedure, if the Plaintiff wishes to appeal from this Order he or she must do so by

filing a notice of appeal within the time period as provided in Rule 3, Fed. R. App. P.

BY THE COURT,

/s/ Maureen P. Kelly
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

Dated: September 30, 2014

cc:     All counsel of record by Notice of Electronic Filing